UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
D.N. and J.V.N., on behalf of D.N.,

Plaintiffs,

-against-

**MEMORANDUM & ORDER**
CV 14-99 (GRB)

BOARD OF EDUCATION OF CENTER MORICHES UNION FREE SCHOOL DISTRICT

Defendant.
-----------------------------------------------------------X
**GARY R. BROWN, United States Magistrate Judge:**

This matter, which has become a struggle of Dickensian magnitude,[1] was commenced nearly six years ago before an Impartial Hearing Officer ("IHO"), who held a hearing extending over two years, which generated 3,389 pages of transcript, a 158-page decision by the IHO, two appeals before State Review Officers ("SROs"), and one prior federal court review. This case is once again before this Court.

Plaintiffs D.N. and J.V.N. ("Parents"), individually and on behalf of their child D.N. (collectively "plaintiffs"), and the defendant the Board of Education of the Center Moriches Union Free School District ("defendant" or "District") cross-move for summary judgment pursuant to the Individual with Disabilities Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*[2] Docket Entries ("DE") 19, 20.

The specific question before the Court is whether plaintiffs are entitled to tuition

---

[1] *See, e.g.*, Charles Dickens, *Bleak House* (1853).
[2] "Congress amended the IDEA by enacting the Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA"), Pub. L. No. 108–446, 118 Stat. 2647, which took effect on July 1, 2005. Courts, however, continue to refer to the amended act as the IDEA. Except where noted, the statutory citations in this Opinion are to the IDEA as amended by the IDEIA." *A.D. v. New York City Dep't of Educ.*, No. 12 CIV. 2673 RA, 2013 WL 1155570, at *1 n.1 (S.D.N.Y. Mar. 19, 2013).

reimbursement for the 2009-2010 school year for having unilaterally placed D.N. in the Empowering Long Island's Journey Through Autism ("ELIJA") School. The District had agreed to fund D.N.'s pendency placement at ELIJA for the 2009-2010 school year. Mem. & Order 4, No. 12-CV-1288, DE 20-4. However, as previously held by the Honorable Arlene R. Lindsay, United States Magistrate Judge, this matter is not moot because it was "capable of repetition, yet evading review." *Id.*

Upon review, I find that the District failed to establish that the Individualized Education Plan ("IEP") offered D.N. a free and appropriate public education ("FAPE") for the 2009-2010 school year, while plaintiffs have established that their unilateral placement at ELIJA was appropriate, and that the equities favor the plaintiffs, and thus, the Parents were entitled to a tuition reimbursement for the 2009-2010 school year. Therefore, plaintiffs' motion for summary judgment is GRANTED, and defendant's motion for summary judgment is DENIED.

## BACKGROUND

### 1. Statutory Framework

"The IDEA seeks to provide all children with disabilities 'a free appropriate public education that emphasizes special education and related services.'" *H.W. v. New York State Educ. Dep't*, No. CV 13-3873 SIL, 2015 WL 1509509, at *13 (E.D.N.Y. Mar. 31, 2015) (quoting *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 831 (2d Cir. 2014)). "A free appropriate public education ("FAPE") 'consists of special education and related services to meet the unique needs of a particular child, which are reasonably calculated to enable to the child to receive educational benefits, and provided in conformity with an individualized educational program, or IEP.'" *Id.* (quoting *Reyes ex. rel. R.P. v. New York City Dep't of Educ.*, 760 F.3d

211, 214 (2d Cir. 2014)); *see also C.F. ex. rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 72 (2d Cir. 2014).

The IEP represents "[t]he centerpiece of the IDEA's educational delivery system." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012); *see also K.M. v. New York City Dep't of Educ.*, No. 13-cv-7719 (LAK)(FM), 2015 WL 144215, at *3 (S.D.N.Y. 2015). The law provides specific requisites for the creation, implementation and content of an IEP. First, "IEPs must include 'a comprehensive statement of the educational needs of [the] handicapped child and specially designed instruction and related services to be employed to meet those needs.'" *C.F. ex. rel. R.F.*, 746 F.3d at 72. In addition, "the IEP must be 'likely to produce progress, not regression, and [must] afford [] the student with an opportunity greater than mere trivial advancement." *Id.* (quoting *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009)). Furthermore, an "IEP must be reviewed at least annually and revised to reflect the child's need." *H.W.*, 2015 WL 1509509, at *1 (citing 20 U.S.C. § 1414(d)(2-4)).

In the first instance, "the state has assigned responsibility for developing IEPs to local Committees on Special Education ["CSEs"]," *C.F. ex rel. R.F.*, 746 F.3d at 72, which "are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." *Id.* (citing N.Y. Educ. Law § 4402(1)(b)(1)(a); 8 N.Y.C.R.R. § 200.3(a)). The development of an IEP requires consideration of four factors: "(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs," otherwise known as "SPAMs." *M.H.*, 685 F.3d at 224; *H.W.*, 2015 WL 1509509, at *2.

A parent dissatisfied with an IEP "may challenge it in an 'impartial due process hearing,' 20 U.S.C. § 1415(f), before an [IHO] appointed by the local board of education.'" *M.H.*, 685 F.3d at 224 (citing N.Y. Educ. Law § 4404(1)); *see also H.W.*, 2015 WL 1509509, at *2; *K.M.*, 2015 WL 1442415, at *4. "The parents may also unilaterally 'enroll the child in a private school and seek reimbursement for the cost of private school education from the local educational agency." *H.W.*, 2015 WL 1509509, at *2 (citing *C.L.*, 744 F.3d at 831).

At the due process hearing, the school district bears the burdens of proof, persuasion and production of demonstrating the appropriateness of the IEP, although a parent "seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of such placement." *M.H.*, 685 F.3d at 225 (quoting N.Y. Educ. Law § 4404(1)(c)). The IHO's decision may be appealed to an SRO, an officer of the New York State Department of Education. *Id.*; *H.W.*, 2015 WL 1509509, at *2; *K.M.*, 2015 WL 1442415, at *4. Following such review, "either 'party aggrieved' by the findings of the SRO 'shall have the right to bring a civil action' in either state or federal court." *M.H.*, 685 F.3d at 225 (citing 20 U.S.C. § 1415(i)(2)(A)); *see also H.W.*, 2015 WL 1509509, at *2; *K.M.*, 2015 WL 1442415, at *4.

**2. Procedural Background**

In this case, J.V.N. filed a due process complaint on August 19, 2009 for a hearing before an IHO. IHO 2, DE 20-2. On December 5, 2011, IHO Wendy K. Brandenburg, Esq. issued a decision that concluded that the District had provided D.N. with a FAPE for the 2009-2010 school year. *Id.* Upon the Parents' timely appeal, SRO Stephanie Deyoe issued a decision that concluded plaintiffs' appeal moot upon the ground that "the 2009-10 school year expired on June

30, 2010, and the student remained entitled to his pendency placement at the ELIJA School funded by the district through the conclusion of the administrative process." First SRO 6-7, DE 20-3. Thus, the First SRO disposed of the matter without resolving any substantive issues.

J.V.N. appealed that decision to federal court. Compl., No. 12-CV-1288 DE 1. The parties then consented to magistrate judge jurisdiction, and the case was referred to Magistrate Judge Lindsay to conduct all proceedings. No. 12-CV-1288, DE 11. On September 25, 2013, Judge Lindsay held that the matter was not moot because this case was "capable of repetition, yet evading review," and "a decision by this court would determine D.N.'s pendency rights going forward, changing his pendency placement from ELIJA to a public school placement." Mem. & Order 4-5 & n.5, No. 12-CV-1288, DE 25. Judge Lindsay also found that "the court finds itself ill-equipped to address [the substantive issues] without the benefit of review of the SRO," and remanded the case to the SRO for a ruling on the merits. *Id.*

On October 25, 2013, SRO Justyn P. Bates issued a decision, which concluded that the District offered D.N. a FAPE during the 2009-2010 school year. Second SRO, DE 20-1. The Parents commenced the instant action by filing a complaint on January 7, 2014. DE 1. The parties consented to magistrate judge jurisdiction, whereby the case was reassigned to the undersigned to conduct all proceedings on January 17, 2014. DE 7, 8. The parties then filed the instant cross-motions for summary judgment on September 4, 2014. DE 19, 20.

### 3. Factual Background

The facts are drawn from materials submitted to the Court including a certified copy of the administrative record, transcripts and exhibits from the impartial hearing, and the parties' local 56.1 statements. The facts are undisputed unless otherwise noted.[3]

D.N. is an autistic child born on May 14, 1999, who is entitled to receive from the District a FAPE, including special education services. Pls.' 56.1 ¶¶ 1, 3, DE 20; Deft.'s 56.1 Response ¶¶ 1, 3, DE 19; IHO 8, 20-2.

In the 2007-2008, and 2008-2009 school years, the District funded D.N.'s placement at the ELIJA School. Pls.' 56.1 & Deft.'s 56.1 Response ¶ 4. The parties dispute whether the District recommended ELIJA to the Parents for 2007-2008 and 2008-2009 school years. According to plaintiffs, the district recommended ELIJA with additional home-based Applied Behavior Analysis ("ABA") services for 2007-2008 and 2008-2009 school years. Pls.' 56.1 ¶ 4. According to defendant, the IEP for 2007-2008 school year recommended a home-based individualized program with ABA, but for the 2008-2009 school year, ELIJA was a pendency placement based on a Stipulation of Settlement. Deft.'s 56.1 Response ¶ 2 (citing Tr. 451, 2476). The IHO credited the Parent's account that CSE recommended placement at ELIJA. *Id.*;

---

[3] Many of defendant's responses to plaintiff's 56.1 statements generally include unsupported denials. *See, e.g.*, Deft.'s 56.1 Response ¶¶ 55-59, DE 19 (stating "[d]enies the allegations set forth in paragraph [x] of Pl 56.1 , and respectfully refers to the Court to the transcript citations for their full meaning and content"). Moreover, in several instances, rather than providing a substantive response, defendant "denies the relevancy of the testimony," *see, e.g., id.* at ¶¶ 41, 46, and "[d]enies the reliability of the allegations set forth in paragraphs 61 and 62 of Pl 56.1." *Id.* at ¶ 61. The Local Civil Rules provide that "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph to be served by the opposing party." Local Civ. R. 56.1(c). District courts within this circuit have applied the Local Civil Rule 56.1 procedure to IDEA cases. *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07 CIV. 8828 ER, 2013 WL 3929630, at *1 (S.D.N.Y. July 30, 2013), *appeal dismissed* (Dec. 10, 2013); *Carmel Cent. Sch. Dist. v. V.P. ex rel. G.P.*, 373 F. Supp. 2d 402, 408 (S.D.N.Y. 2005), *aff'd*, 192 F. App'x 62 (2d Cir. 2006); *Davis ex rel. C.R. v. Wappingers Cent. Sch. Dist.*, 772 F. Supp. 2d 500, 503 (S.D.N.Y. 2010) *aff'd sub nom. Davis v. Wappingers Cent. Sch. Dist.*, 431 F. App'x 12 (2d Cir. 2011). As such, the Court treats these unsupported denials as admissions.

IHO 13. D.N. has also received speech, physical, and occupational therapies at home in the past, such as in the 2005-2006 and 2007-2008 school years. IHO 13, 24.

For the 2009-2010 school year, the District funded D.N.'s pendency placement at ELIJA, while providing D.N. with ABA analysis, ABA supervision and consultation, parent training, transportation, speech therapy, and physical therapy. IHO 1.

*a. CSE Meetings*

The CSE held four meetings to develop D.N.'s IEP for the 2009-2010 school year, which meetings were held on April 30, 2009, May 14, 2009, June 19, 2009, and July 21, 2009. Pls.' 56.1 & Deft.'s 56.1 Response ¶ 5. D.N.'s mother, J.V.N., was were present at all four CSE meetings on behalf of both parents. *See, e.g.*, *id.* at ¶¶ 9, 11, 15, 22; IHO 18 (J.V.N. stating she needed to discuss certain decisions with her husband). J.V.N. was absent from the telephone conference on June 9, 2009. Pls.' 56.1 & Deft.'s 56.1 Response ¶ 14. The parties created the IEP in large part due the discussions that took place during the June 19, 2009 and July 21, 2009 meetings. *See also* IHO 146 (finding that although J.V.N. missed the telephone conference on June 9, "she fully participated in the CSE meetings that followed on June 19 and July 21); Second SRO 9.

At the June 19 meeting, J.V.N. and ELIJA Executive Director, Debora Harris voiced their concern that D.N. had too many related service goals, and D.N. unsuccessfully attempted related service goals in the past, which triggered problem behaviors, such as tantrums. Pls.' 56.1 & Deft.'s 56.1 Response ¶¶ 15-17; IHO 17; Second SRO 4. According to the Second SRO, approximately fifteen goals were deleted due to J.V.N.'s concerns. Second SRO 4. The CSE discussed SPAMs and goals and objectives for D.N., and by the end of the meeting, Mr. Cruz

asked Ms. Harris to enter the discussed related service goals and SPAMs into the District's computerized IEP system. Pls.' 56.1 & Deft.'s 56.1 Response ¶ 20. Plaintiffs were not provided with an IEP at the conclusion of the June 19 meeting. *Id.* at ¶ 21. Defendant argues that changes had to be made to the draft IEP because "Elija's goals were not measurable or proper and because the present levels of performance identified by Elija needed further revision," and the agreed-upon SPAMs "did not adequately identify D.N.'s needs and abilities, and had to be reviewed 'very closely.'" *Id.*

The CSE convened for a final meeting on July 21, 2009. Pls.' 56.1 & Deft.'s 56.1 Response ¶ 22. J.V.N. testified that she reviewed a draft of the IEP with Ms. Harris at the beginning of the July 21 meeting. Tr. 2525-26. J.V.N. requested that D.N. continue to attend ELIJA and other non-public ABA programs at the July 21 meeting. *Id.* at ¶¶ 22, 24. According to the IHO, J.V.N. reiterated her concerns about related service goals and SPAMs from the June 19 meeting. IHO 17-18. J.V.N. then requested a written IEP so that she could discuss it with her husband. *Id.* at 18. The CSE then spent 15-16 hours, making recommendations for D.N. for the 2009-2010 school year. *Id.* The parties disagree whether the recommended program was appropriate for D.N.

The CSE recommended a 1:1:1 (1 student, 1 teacher, 1 aide) special class in the District for D.N. at the July 21 meeting. Pls.' 56.1 & Deft.'s 56.1 Response ¶ 22; IHO 18; Second SRO 4. On July 28, 2009, the Parents mailed the District a letter stating that they had not received the "necessary information that was to be provided to us [by July 24, 2009]," and stated their intention to "continue [D.N.'s] placement at the ELIJA school at the district expense and will seek reimbursement including transportation costs to and from the ELIJA school." Pls.' Ex. P-U

at IHO. On July 29, 2009, the Parents received a written IEP. Pls.' 56.1 & Deft.'s 56.1 Response ¶ 28; Second SRO 5 (citing to Pls.' Ex. C at IHO).

*b. The IEP*

The IEP included the following:

> The CSE recommended a 1:1:1 special class in the district for the student, along with related services of speech-language therapy and speech-language therapy direct consult services; occupational therapy (OT) and OT direct consult services; physical therapy; and parent counseling and training (see Dist. Exs. 17 at p. 29; 18 at pp. 1-2; see also Dist. Exs. 2-3; 5-14). In addition, the CSE recommended the services of an autism consultant, testing accommodations, extended school year services, the use of an augmentative communication device (assistive technology), special transportation, and supports for school personnel such as an autism consultant, a behavior management consultant, and a speech-language therapy consultation (see Dist. Exs. 17 at pp. 29-30; 18 at pp. 1-2). The district also developed a transition plan (see Dist. Exs. 16, 20).

Second SRO 4; *see also* IHO 18-19; Dist. Ex. 17 at IHO at 29-34.

Under one of the SPAMS—entitled "Social Development," the IEP set forth the following "[n]eeds" for D.N.:

> [D.N.] needs to learn how to make request [sic] with peers and adults during preferred leisure activities. He needs to make eye contact with peers and adults. He needs to reciprocate greetings with a peer. He needs to sit appropriately with a peer during a preferred activity. He needs to answer social questions. He needs to answer simple "what" or "where" questions.
> [D.N.] needs frequent tangible reinforcement to sustain attention.

Dist. Ex. 17 at IHO at 6. The IEP further set forth the following annual goal: "When [D.N.] is greeted by a peer, [D.N.] will respond with an appropriate gesture/greeting using his verbal skills or Dynavox with no more than 1 prompt with 80% accuracy over a period of three days." *Id.* at 25.

However, the recommended program under the IEP sets forth no means for D.N. to interact with peers. Ex. 17 at IHO at 29-34. Not only does his special class require "1 teacher, 1

student, 1 aide," but his therapy sessions are also of a 1:1 nature. Dist. Ex. 17 at IHO at 29 ("1:1 Speech Services/1:1 Occupational Therapy Services/ 1:1 Physical Therapy Services"). The testimony by a District's witness at the IHO hearing revealed that D.N. would not have interacted with any other children, neither at the cafeteria nor at the playground, in the 1:1:1 special class. Tr. 799-800.

*c. ELIJA*

It is undisputed that for 2009-2010 school year, D.N. was in a class at ELIJA with three other students, one lead teacher, and three ABA instructors. Pls.' 56.1 & Deft.'s 56.1 Response ¶ 58. Plaintiffs characterize such a class as a "4:1:3 (4 students, 1 lead teacher, 3 instructors)." Pls.'s Br. 6 (citing Tr. 1097, 1737, 2896, 3129; Pls.' Ex. A, B). According to plaintiffs, "D.N. interacted with his three classmates, which served as a significant component of his daily social skills programming." Pls.' 56.1 ¶ 59 (citing Tr. 1189-1190). Defendant characterizes the program differently: "D.N. is taught 1:1, 30 hours a week. Although there were four students in the room, all four were working 1:1 with no interaction among them . . . such [that it] cannot be considered a 4:1:3 program as plaintiffs allege." Deft.'s Reply Br. 9 (citing Tr. 1189-90, 2661, 2734, 2910; Second SRO 10, 15).

The Second SRO credited defendant's description, stating that "the student was receiving 1:1 instruction, but at times there were up to three other instructors and students also in the same room, all receiving 1:1 instruction, although the student did not appear to notice or acknowledge the others." Second SRO 10 (citing Tr. 1189-90, 2661, 2734, 2910). The Second SRO also stated that "[t]he founder of the ELIJA school confirmed that all students there receive 1:1 teaching." *Id.* at 15 (citing Tr. 1091).

This characterization by the Second SRO misstates the evidence. Dr. Carol Fiorile, a Board Certified Assistant Behavioral Analyst who evaluated D.N.—a witness whom the IHO credited in support of the 1:1:1 special program, IHO 149—observed D.N. having interactions with other peers at ELIJA:

> One [sic] when D. was seated at the computer with another student and another time where the boy came in to ask D. to go on the trampoline with him, and the teacher was using inter-verbals to evoke responses between the two boys.

Tr. 2545. Dr. Fiorile also testified that it was part of ELIJA's program to develop D.N.'s interest in the people around him. *Id.* at 2544-45; *see also id.* at 2548 ("He has not learned that to a mastered level but it is certainly a goal that [ELIJA] work[s] on, social interaction with peers."). Dr. Fiorile also testified that ELIJA's long-term goal is for D.N. "[t]o have a conversation with the other student, to begin by having one exchange back and forth of language exchange, and then to expand that into multiple language exchanges." *Id.* at 2549.

It is further uncontroverted that "ELIJA's curriculum was designed to improve D.N.'s independence, and included work in areas of attending, expressive, and receptive language, leisure skills, self-care, and prerequisite skills for academics." Pls.' 56.1 & Deft.'s 56.1 Response ¶ 60 (citing Tr. 1319-1320). Defendant generally denies this assertion, arguing that "academics was not the focus of Elija's program." Deft.'s 56.1 Response ¶ 60. J.V.N. testified that D.N. "made progress on all of his IEP goals" during the 2008-2009 school year at ELIJA, including academic progress. Tr. 2483-84.

ELIJA's progress report also indicated that D.N.'s problem behavior were at low rates at ELIJA, such that D.N. was "available for learning throughout the year much more so than he had in the past." Pls.' 56.1 & Deft.'s 56.1 Response ¶ 61. Defendant fails to controvert this assertion. Deft.'s 56.1 Response ¶ 61.

Plaintiffs argue that D.N. progressed using his Dynavox, and increased his response to social questions. Pls.' 56.1 ¶ 62. Defendant provides a general denial, but argues that D.N. still did not shed some targeted behaviors, which shows regression rather than progression. Deft.'s 56.1 Response ¶ 62 (citing Tr. 1630). The Court treats this response as an admission.

Plaintiffs argue that D.N. improved his ability to follow one-step directions, maintain learned skills, identify objects and increased his expressive and receptive language. Pls.' 56.1 ¶ 63. Defendant cites to the IHO, which found that during the 2008-2009 school year, D.N. "demonstrated very limited self-help skills." Deft.'s 56.1 Response ¶ 63 (citing IHO 97). Nevertheless, it is undisputed that D.N. improved his generalization, eye-contact, typing, and self-care skills, which defendant fails to dispute. Pls.' 56.1 ¶ 64 (citing Tr. 1824); Deft.'s 56.1 Response ¶ 64.

Defendant argues that ELIJA lacks "SED" approval, deft.'s br. 16, and that even though ELIJA "employs a 1:1 instructional model that utilizes ABA methodology, . . . none of its curricula conform to NYS standards." *Id.* Finally, defendant argues that D.N. did not have occupational therapy, physical therapy, nor speech therapy at ELIJA for 2008-2009 school year. Deft.'s Br. 16 (citing Tr. 1773).[4]

*d. IHO*

After a hearing extending over a two-year period,[5] the IHO issued a 158-page decision, which concluded that the District met its burden in proving that it offered D.N. a FAPE for the

[4] According to J.V.N., in 2007-2008 school year D.N. received physical therapy, speech therapy in conjunction with D.N.'s program at ELIJA. Tr. 2460. J.V.N. consented to related service evaluations of speech therapy, occupational therapy, and physical therapy in April 30, 2009 for the 2008-2009 school year. *Id.* at 2476.

[5] In fairness, the IHO noted that the long period over which the hearings extended were due to, in part, J.V.N.'s illness. IHO 3.

2009-2010 school year. IHO 156. Despite its heft, the decision mainly constitutes a summary of the massive record—only the last few pages of the determination contain any analysis or findings. *Id.* at 137-158. The IHO made the following findings, among others: J.V.N. fully participated in the CSE meetings on June 19 and July 21 even though she missed the teleconference with the CSE on June 9. *Id.* at 146. The IHO also found that the goals and objectives in the IEP were appropriate. *Id.* at 147.

On the question of the least restrictive environment, the IHO held that "by *legal definition*, a special class located in a public school in which a student resides, where a Student would have exposure to both disabled and non-disabled peers, is less restrictive than a program located in a private school consisting solely of disabled students." *Id.* at 148 (citing 8 N.Y.C.R.R. §§ 200.1(cc), 200.6(g), 200.13) (emphasis added). The IHO found that 1:1:1 classroom was appropriate "prior to pairing him with other students, for his safety, as well as the safety of the students whom he would be placed." *Id.* at 149. The IHO also cites Dr. Fiorile's testimony, suggesting that it supports the District's recommended program for D.N. *Id.* In fact, Dr. Fiorile testified to the contrary:

> They didn't say how long it would take him to actually go into the other classroom where there would be eight students in total. So it could go on for an indefinite amount of time. And I think it's not appropriate for a child to be educated in a classroom by himself. . . .

Tr. 2590.

Importantly, nowhere in the IEP did the District provide for any contact between D.N. and other students. *See generally* Dist. Ex. 17 at IHO. The IHO considered testimony by the District officials that it intended to place D.N. in an 8:1:1 classroom, if and when it became appropriate. *Id.* at 149 ("The evidence shows that the CSE intended to include one or more

students from the 8:1:1 autism classroom into the Student's classroom as soon as he could tolerate it.").

The IHO otherwise found that the training and certification of the District's staff, in areas such as autism consulting, consulting with the speech therapist for training staff to use Dynavox V, staff training in crisis intervention, among others, were appropriate. *Id.* at 149-58. These findings are largely undisputed.

*e. Second SRO*

Following the remand from Judge Lindsay, the Second SRO issued a 16-page decision, which concluded that "the recommended 1:1:1 special class in the district's elementary school with related services was reasonably calculated to provide the student with educational benefits and, therefore offered him a FAPE during the 2009-10 school year." Second SRO 16.

The Second SRO found that the 1:1:1 placement was appropriate, claiming that the parents' experts agreed that the program at the ELIJA School was a "1:1 program." *Id.* at 10. Incongruently, the Second SRO acknowledges that at ELIJA "at times there were up to three other instructors and students also in the same room." *Id.* The Second SRO found that the "annual goals and objectives were consistent with the student's needs in all areas," based upon the IHO's findings that the CSE had numerous evaluations and observation of D.N., and opportunities to determine D.N.'s needs and goals. *Id.* The Second SRO also found that the "hearing record supports that the student required a high degree of individualized attention and that an intensive 1:1 ABA-based program was appropriate" based upon the IHO's findings that the "district's program was designed to address the student's academic, social and behavioral

needs, and was reasonably calculated to enable him to receive educational benefits." *Id.* (citing IHO 145-57; Dist. Exs. 3, 17, Tr. 2309, 2828).

The Second SRO also found that the prospective inclusion of D.N. in the 8:1:1 class (or, in another variant, the theoretical integration of students from the 8:1:1 class into D.N.'s program) "was not required to be referenced on the student's 2009-10 IEP because the program recommendation was a 1:1:1 class," and "[i]t was clear from the testimony that there was no proposal for the student to enter into a 8:1:1 class immediately and therefore no need for goals in that regard." Second SRO 12. At the same time, the Second SRO considered the testimony that "[t]he student would initially be taught in a 1:1 setting, with other students eventually being integrated into his classroom, with the eventual goal that he may be integrated into the district's 8:1:1 classroom if appropriate" even though this plan was absent from the IEP. *Id.* at 16.

The Second SRO found that the related services are appropriate for D.N. "based upon the student's behaviors "hav[ing] varied over time, and in fact increased for a time during his placement at ELIJA School, during which times he was removed to a separate classroom by himself." *Id.* at 13.

In rejecting the appeal, the Second SRO based its decision in large part on the determination that the ELIJA program was "more restrictive" than that offered by the District. Second SRO at 15. In fact, the Second SRO agreed with the IHO's conclusion that "the law provides that the ELIJA School is in fact more restrictive" because "[t]he ELIJA School is a private school with only disabled students." *Id.* The Second SRO's determination, expressly contrasting the LRE elements of the proposed IEP program as against the ELIJA program, considered such elements as ELIJA's "distance from the student's home, the fact it was not state

approved, and the fact the student was not having opportunities to integrate with other peers including typical students." *Id.*

## LEGAL STANDARD

### 1. Standard of Review

Actions brought under IDEA "are generally resolved by district courts at the summary judgment stage," *C.L.K. v. Arlington Sch. Dist.*, No. 12 Civ. 7834 (NSR), 2013 WL 6818376, at *8 (S.D.N.Y. Dec. 23, 2013),[6] because "[t]he role of federal courts in reviewing state educational decisions under the IDEA is circumscribed." *C.F. ex rel. R.F.*, 746 F.3d at 77. Though properly styled as a motion for summary judgment, "the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion]." *M.H.*, 685 F.3d at 226; *H.W.*, 2015 WL 1509509, at *13. Summary judgment represents "a 'pragmatic procedural mechanism' for reviewing administrative decisions.'" *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 184 (2d Cir. 2012); *see also M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 138 (2d Cir. 2013); *K.M.*, 2015 WL 1442415, at *10. In reviewing an IEP dispute, a federal court "must base its decision on the preponderance of the evidence." *R.E.*, 694 F.3d at 184; *see also H.W.*, 2015 WL 1509509, at *13. This procedure "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review," *C.F. ex rel. R.F.*, 746 F.3d at 77 (quoting *M.H.*, 685 F.3d at 244), a procedure which has been fairly characterized as "modified *de novo* review." *See, e.g., H.W.*,

---

[6] In certain cases, the Court may remand the case to an SRO for review. *See, e.g., New York City Dep't of Educ. v. V.S.*, No. 10-CV-5120, 2011 WL 3273922, at *10 (E.D.N.Y. July 29, 2011) ("the drawbacks from remanding the case to the SRO outweigh the benefits, particularly where one state administrator has already provided a thoughtful opinion on the merits of the case."). Here, as this case has had an IHO, the First SRO, a federal court opinion, and a Second SRO that determined the case on the merits, the need for timely adjudication of this case greatly outweighs any benefit from yet another remand to the SRO.

2015 WL 1509509, at *13 (citing *A.L. v. New York City Dep't of Educ.*, 812 F. Supp. 2d 492, 501 (S.D.N.Y. 2011)); *P.K. ex rel. S.K. v. New York City Dep't of Educ. (Region 4)*, 819 F. Supp. 2d 90, 103 (E.D.N.Y. 2011), *aff'd*, 526 F. App'x 135 (2d Cir. 2013).

**2. Deference**

"While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally "lack[s] the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998); *see also M.H.*, 685 F.3d at 240; *H.W.*, 2015 WL 1509509, at *13. The analysis of the amount of weight given to administrative proceedings "will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court. . . [and the district court's] acute awareness of institutional competence and role." *M.H.*, 685 F.3d at 244; *accord C.F. ex. rel. R.F.*, 746 F.3d at 77; *H.W.*, 2015 WL 1509509, at *14. The Second Circuit has provided several examples:

> By way of illustration, determinations regarding the substantive adequacy of the IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress. Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not. And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

*C.F. ex. rel. R.F.*, 746 F.3d at 77 n.7 (quoting *M.H.*, 685 F.3d at 244).

As will be described herein, the fundamental problem lies in the fact that the IEP set forth educational goals for D.N., yet provided no means of achieving those goals. This is not a matter of technical expertise or educational policy—rather, the plain language of the IEP requires that D.N. develop skills involving social interaction with peers. However, unlike the program at ELIJA, the 1:1:1 special class offered no contact with any peers. Furthermore, in repeatedly upholding the soundness of the IEP, the IHO made conclusory findings and misstated the evidence regarding the substantive adequacy of the IEP, especially as related to the appropriateness of the goals and objectives, and reliance upon "retrospective testimony."[7] These fundamental errors render the determinations fatally flawed. Despite having been called upon to review this matter to assist the Court, Mem. & Order 5, the Second SRO merely repeated the same conclusions—and the same mistakes—from the IHO. Therefore, the IHO and Second SRO warrant substantially less deference in this case.

### 3. *Burlington/Carter* Test

"Where parents believe that the District's IEP fails to offer the child a FAPE, 'they may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state.'" *H.W.*, 2015 WL 1509509, at *16. The Supreme Court has set forth the three-pronged *Burlington*/*Carter* test to determine whether parents are entitled to tuition reimbursement: "(1) the [District] must establish that the student's IEP actually provided a FAPE; should the [District] fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and

---

[7] The testimony is termed "retrospective" because it is used to "rehabilitate an otherwise deficient IEP because 'the IEP must be evaluated prospectively as of the time of its drafting.'" *M.O. v. New York City Dep't of Educ.*, 793 F.3d 236, 244 (2d. Cir. 2015).

(3) the equities favor them." *H.W.*, 2015 WL 1509509, at *16 (citing *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985)); *see also C.F. ex. rel. R.F.*, 746 F.3d at 76; *K.M.*, 2015 WL 1442415, at *11.

Under the first prong of the *Burlington*/*Carter* test, the Second Circuit has set forth the following standard:

> To decide whether an IEP complies with the IDEA, we follow a two-part test. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07, 102 S. Ct. 3034, 73 L.Ed.2d 690 (1982). The first part examines the procedural adequacy of the IEP, asking "whether the state has complied with the procedures set forth in the IDEA." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir.2012) (quoting *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir.2005)). Procedural violations will entitle parents to reimbursement only if they "impeded the child's right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child," or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); *see also R.E.*, 694 F.3d at 190. The second part of the test examines the substantive adequacy of the IEP by asking whether it was "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S. Ct. 3034; *see also R.E.*, 694 F.3d at 190. . . . "Substantive inadequacy automatically entitles the parents to reimbursement," as long as the parents' alternative placement was appropriate and equitable considerations favor reimbursement. *M.W.*, 725 F.3d at 143 (quoting *R.E.*, 694 F.3d at 190); *see also Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15–16, 114 S. Ct. 361, 126 L.Ed.2d 284 (1993); *Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–71, 105 S. Ct. 1996, 85 L.Ed.2d 385 (1985).

*T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 160-61 (2d Cir. 2014).

## DISCUSSION

### 1. Retrospective Testimony

The parties dispute whether the SRO and IHO impermissibly relied upon "retrospective testimony" when the CSE recommended the 1:1:1 program with the District's "future plan" of

"evaluat[ing] the ability of [D.N.] to integrate into the District's 8:1:1 class." Pls.' Br. 5; *see also* Deft.'s Reply Br. 1-2.[8]

The Second Circuit has held "that retrospective testimony that the school district *would have* provided additional services beyond those listed in the IEP may not be considered in a *Burlington/Carter* proceeding." *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 142 (2d Cir. 2013) (citing *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 186 (2d Cir. 2012)). "[I]f an IEP states that a specific teaching method will be used to instruct a student, the school district may introduce testimony at the subsequent hearing to describe that teaching method and explain why it was appropriate for the student. The district, however, may not introduce testimony that a different teaching method, not mentioned in the IEP, would have been used." *Id.* (citing *R.E.*, 694 F.3d at 186-87). The remedy for having considered retrospective testimony is to disregard the improper testimony, and then decide whether the child was offered a FAPE. *R.E.*, 694 F.3d at 193.

As the Court of Appeals explained, "the adequacy of the IEP itself creates considerable reliance interests for the parents." *R.E.*, 694 F.3d at 186. The logic underlying this policy is clear: parents must decide whether to enroll the student in the proposed educational offering or seek alternatives based on the information presented in the IEP. *See id.*

Here, the IHO and the SRO impermissibly relied upon retrospective testimony that District officials intended to place D.N. in an 8:1:1 classroom, if and when it became appropriate, or introduce students from the 8:1:1 classroom into D.N.'s classroom setting, while

---

[8] Plaintiffs also argue that "the SRO relied on retrospective testimony regarding the District's 'plan' to modify D.N.'s [Behavior Intervention Plan ("BIP")] at some unspecified date." Pls.' Br. 16 (citing Second SRO 13); *see also* Second SRO 13 (considering the testimony that the District will create a BIP from ELIJA's BIP—even though this plan was missing from the IEP). Because the alleged procedural inadequacies are largely irrelevant in this case, as will be explained below, the Court does not reach whether this constitutes retrospective testimony.

the IEP is devoid of any reference of such steps. Indeed, the IHO is replete with references to the 8:1:1 classroom, and its relevance to D.N.'s educational plan. *See, e.g.*, IHO 6, 47, 49, 57, 58, 63. In upholding the IEP, the IHO specifically, and crucially, found that D.N. would have been placed in an 8:1:1 classroom when it was appropriate to do so. *Id.* at 149. Similarly, the Second SRO also considered the retrospective testimony that "[t]he student would initially be taught in a 1:1 setting, with other students eventually being integrated into his classroom, with the eventual goal that he may be integrated into the district's 8:1:1 classroom if appropriate." Second SRO 16. This Court must disregard the retrospective testimony regarding the 8:1:1 in considering whether the District offered D.N. a FAPE for 2009-2010 school year.

### 2. *Burlington/Carter* Test

The parties dispute whether *Burlington/Carter* factors weigh in favor of granting plaintiffs tuition reimbursement for D.N.'s program for the 2009-2010 school year. Deft.'s Br. 20, DE 19; Pls.' Br. 20, DE 20; Deft.'s Reply Br. 1, DE 19; Pls.' Reply Br. 10, DE 20.

#### a. Whether the IEP offered D.N. a FAPE

A substantive violation is sufficient to find that the District failed to offer a FAPE. *T.M. ex rel. A.M.*, 752 F.3d at 160-61. Because there exists a significant issue of the substantive adequacy of the IEP, the purported procedural violations are largely irrelevant. Therefore, the Court proceeds to analyze the substantive aspects of the IEP.

*A. Least Restrictive Environment*

Plaintiffs argue that "the District's recommended 1:1:1 'special class' was an overly restrictive setting which would have been a step backwards for D.N., who had successfully attended a class with other students at ELIJA." Pls.' Br. 6-7. Defendant argues that the IHO and the Second SRO found that the special class met the Least Restrictive Environment requirement, and should be given deference. Deft.'s Br. 12-13.

The Least Restrictive Requirement ("LRE") represents an element of the IEP's substantive adequacy. *T.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 161 (2d Cir. 2014). The LRE requirement of the IDEA states:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

*Id.* (quoting 20 U.S.C. § 1412(a)(5)(A)). The Second Circuit has set forth a two-step, "flexible, fact-specific analysis" to determine whether the District met the LRE requirement: (1) "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child," and (2) "if not, then 'whether the school has mainstreamed the child to the maximum extent appropriate.'" *Id.*

Here, it is undisputed that D.N. cannot be placed in a regular classroom. *See generally* Pls.' Br. 6-8; Deft.'s Br. 12-15. Rather, the parties dispute whether the District has mainstreamed D.N. to the maximum extent appropriate. Pls.' Br. 6-8; Deft.'s Br. 12-15. To the extent that cases have held that a school with mainstream students is less restrictive than a school consisting of only disabled students, see, e.g., *T.M.*, 752 F.3d at 161; *M.H.*, 685 F.3d at 253, none

of those cases involved a situation where, as here, the disabled student would be segregated from *all* other students. In these circumstances, it defies logic and common sense to credit the District with offering D.N. the least restrictive environment simply because the proposed 1:1:1 setting happened to be held in a school building that contained mainstream students, when according to the IEP, D.N. would have no contact with any other students—disabled or non-disabled. Ex. 17 at IHO at 29-34; Tr. 799-800 (District's witness testifying that D.N. would not have interacted with any other children, neither at the cafeteria nor at the playground in the 1:1:1 special class). From D.N.'s perspective, there would be no difference if the IEP provided that his classes were held at a local public school, on a desert island, or in an abandoned warehouse. *cf. M.H.*, 685 F.3d at 254 ("the special education children use a separate entrance to the school, eat in a separate cafeteria, and do not share academic classes.").

At the same time, the IHO and Second SRO plainly erred in disallowing tuition reimbursement because ELIJA does not offer the LRE. *See, e.g.*, IHO 148 ("by legal definition, a special class located in a public school in which a student resides, where a Student would have exposure to both disabled and non-disabled peers, is less restrictive than a program located in a private school consisting solely of disabled students"); Second SRO 15. As the Second Circuit has held,

> "parents . . . may not be subject to the same mainstreaming [or LRE] requirements as the school board." *M.S.*, 231 F.3d at 105 (citing *Warren G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 84 (3d Cir. 1999); *see also Frank G.*, 459 F.3d at 364. As the Fourth Circuit has pointed out, the IDEA's LRE requirement 'was aimed at preventing *schools* from segregating [disabled] students from the student body," but not necessarily "to restrict *parental* options when the public schools fails to comply with the requirements of the [IDEA]." *Carter ex rel. Carter v. Florence Cnty. Sch. Dist. Four*, 950 F.2d 156, 160 (4th Cir. 1991) (citing H.R. Rep. no. 94-332 (1975)), *aff'd*, 510 U.S. 7, 114 S. Ct. 361, 126 L. Ed. 2d 284 (1993).

*C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837 (2d Cir. 2014). Thus, "[r]estrictiveness may be relevant in choosing between two or more otherwise appropriate private placement alternatives, or in considering whether a private placement would have been more restrictive than necessary to meet the child's needs, but where the public school system denied the child a FAPE, *the restrictiveness of the private placement cannot be measured against the restrictiveness of the public school option*." *Id.* (emphasis added). Since both the IHO and Second SRO applied precisely such analysis, this constituted error.

*B. Goals and Objectives/Calculated to Produce Progress*

The parties dispute, *inter alia*, whether the IEP was reasonably calculated to make educational progress towards the goals and objectives. *See generally* Pls.' Br. 8-10; Deft.'s Br. 8-12. This Court finds that it was not. By its own terms, the IEP fails to address the very goals and objectives that it sets forth.

The IEP identifies the following needs regarding D.N.'s social development:

> [D.N.] needs to learn how to make request with peers and adults during preferred leisure activities. He needs to make eye contact with peers and adults. He needs to reciprocate greetings with a peer. He needs to sit appropriately with a peer during a preferred activity. He needs to answer social questions. He needs to answer simple "what" or "where" questions.
> [D.N.] needs frequent tangible reinforcement to sustain attention.

Dist. Ex. 17 at IHO at 6. The IEP also sets a goal that "[w]hen [D.N.] is greeted by a peer, [D.N.] will respond with an appropriate gesture/greeting using his verbal skills or Dynavox with no more than 1 prompt with 80% accuracy over a period of three days." *Id.* at 25.

The term "peer" usually refers to a fellow student in IDEA cases. *See, e.g.*, *M.H.*, 685 F.3d at 224 (defining "peer" in the context of LRE); *E.C. v. Bd. of Educ. of City Sch. Dist. of New Rochelle*, No. 11 CIV. 9429 ER, 2013 WL 1091321, at *1 (S.D.N.Y. Mar. 15, 2013)

(same). The IEP adopted the same definition. Dist. Ex. 17 at IHO at 6 ("[D.N.] needs to learn how to make request [sic] with *peers and adults* during preferred leisure activities." (emphasis added)).

However, under the recommended program, D.N. would have been educated with 1:1:1 special class during the 2009-2010 school year. Not only does his special class require "1 teacher, 1 student, 1 aide," but his therapy sessions are also of a 1:1 nature. Dist. Ex. 17 at IHO at 29. The terms of the IEP and permissible testimony adduced at the IHO hearing show that D.N. would not be provided with any opportunities to interact with any peers in 2009-2010 school year. Tr. 799-800. As such, it was impossible for D.N. to have accomplished the goals and objectives set forth in the IEP.

Even though the IHO and Second SRO found that the goals and objectives provided D.N. a FAPE, Second SRO 10; IHO 149, this conclusion misses the point: accomplishing D.N.'s goals and social needs were simply impossible under the plan set forth. Therefore, as drafted, the recommended 1:1:1 placement was not reasonably calculated to enable to D.N. to receive educational benefits, and D.N. was denied a FAPE.

**b. Appropriateness of the Private Placement**

"When parents unilaterally place their child in a private school because that child has been denied a FAPE, the parents bear the burden of establishing that the private school they have chosen is appropriate." *H.W.*, 2015 WL 1509509, at 19 (citing *Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist.*, 773 F.3d 372, 386 (2d Cir. 2014)). "[T]he review of the private placement 'is more informal than review of the original IEP: a private placement need not meet the IDEA requirement for a FAPE." *Id.* (citing *R.E.*, 694 F.3d at 187 n.3). "The main inquiry is

'whether a placement—public or private—is reasonably calculated to enable the child to receive educational benefits." *Id.* (citing *Gagliardo*, 489 F.3d at 112); *see also C.F. ex rel. R.F.*, 746 F.3d at 82. The Court must look to the "totality of the circumstances" to determine whether the placement provides "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." *Id.*

Here, neither the IHO nor the Second SRO had an opportunity to determine the appropriateness of the private placement because they found that the recommended 1:1:1 program offered D.N. a FAPE. IHO 158; Second SRO 16. Based upon the totality of the circumstances, the Court finds that ELIJA was an appropriate private placement.

As an initial matter, the District agreed to place D.N. at ELIJA for the 2007-2008 and 2008-2009 school year. Pls.' 56.1 & Deft.'s 56.1 Response ¶ 4. Whether the District affirmatively recommended it, or whether they agreed to it as a Stipulation of Settlement is immaterial, the District consented to the adequacy of such program.

Furthermore, it is beyond dispute that D.N. was placed in a classroom with three other students, with each student with a 1:1 instructor. *Id.* at ¶ 58. Such a program with peers would be better suited to achieve the 2009-2010 IEP's social development needs, dist. ex. 17 at IHO at 6.; whereas the recommended 1:1:1 placement provides no avenue to reach such social development needs.

Many of plaintiffs' evidence regarding ELIJA was uncontroverted, including that ELIJA's curriculum was designed to improve D.N.'s independence, and included work in areas of attending, expressive, and receptive language. Pls.' 56.1 & Deft.'s 56.1 Response ¶ 63. D.N. was also able to improve his generalization, eye-contact, typing, and self-care skills. *Id.* at 64.

D.N. was also being instructed on his Dynavox. *Id.* at ¶ 62. All of the instruction at ELIJA was able to meet D.N.'s needs at socialization; none of which could have been met at the recommended 1:1:1 program.

The Second SRO further misstated the evidence regarding D.N.'s social interaction with peers at ELIJA. Second SRO 10 ("the student was receiving 1:1 instruction, but at times there were up to three other instructors and students also in the same room, all receiving 1:1 instruction, although the student did not appear to notice or acknowledge the others."). According to Dr. Fiorile—a witness that the IHO credited, IHO 149—D.N. interacted with other peers at ELIJA. Tr. 2545. Dr. Fiorile also testified that it was part of ELIJA's program to develop D.N.'s interest in the people around him. *Id.* at 2544-45; *see also id.* at 2548. Dr. Fiorile also testified that ELIJA's long-term goal was for D.N. "[t]o have a conversation with the other student, to begin by having one exchange back and forth of language exchange, and then to expand that into multiple language exchanges." *Id.* at 2549.

Defendant argues that the ELIJA School was not "SED" approved, and did not meet New York State's criteria, but cites no authority as to the relevance of such assertions. The Second Circuit has held that "[a]n appropriate private placement need not meet state education standards or requirements." *Frank G. v. Bd. of Educ. of Hyde Park,* 459 F.3d 356, 364 (2d Cir. 2006).

Again, as noted above, the application of the LRE analysis to ELIJA was inappropriate "where the public school system denied the child a FAPE, the restrictiveness of the private placement cannot be measured against the restrictiveness of the public school option." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837 (2d Cir. 2014).

Defendant also argues that D.N. did not have occupational therapy, physical therapy, or speech therapy at ELIJA. Deft.'s Br. 16. In *C.L.*, the Second Circuit held that the fact that the

private placement did not have occupational therapy services did not render the private placement inappropriate where the student was receiving therapy services outside the public school setting, and plaintiffs "were not required in any event to prove that the 'private placement furnishes every special service necessary.'" 744 F.3d at 838-39 (citing *Frank G.*, 459 F.3d at 365). Here, as in *C.L.*, D.N. has received speech and physical therapies in conjunction with ELIJA for the 2009-2010 school year.[9] IHO 1. Moreover, the District has agreed to fund the speech and physical therapies. As such, the Parents are not required to prove that ELIJA furnishes every special service necessary.

Therefore, the Court finds that the plaintiffs have demonstrated that D.N.'s placement at ELIJA School is reasonably calculated to enable D.N. to receive educational benefits.

#### c. Balance of the Equities

As Judge Locke recently observed:

> The final prong of the *Burlington/Carter* test requires the Court to determine whether equitable considerations favor reimbursement. The IDEA provides that reimbursement "may be reduced or denied" for various reasons, including "upon a judicial finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(a)(10)(C)(iii); *see also Frank G.*, 459 F.3d at 363–64 (noting that "because the authority to grant reimbursement is discretionary, equitable considerations relating to the reasonableness of the action taken by the parents are relevant in fashioning relief" (internal quotation marks and citation omitted)).

*H.W. v. New York State Educ. Dep't*, No. CV 13-3873 SIL, 2015 WL 1509509, at *21 (E.D.N.Y. Mar. 31, 2015). In this case, neither the IHO nor the Second SRO offered any findings or conclusions regarding the equities. IHO 158; Second SRO 16.

---

[9] Furthermore, D.N. has received private occupational therapy, physical therapy, or speech therapy services at home in the past, such as during 2005-2006, and 2007-2008 school years. IHO 13, 24.

It is true that reimbursement may be denied or reduced if "the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under IDEA." *C.L.*, 744 F.3d at 840. On this motion, defendant argues—without any factual support—that "plaintiffs predetermined D.N.'s placement at Elija and exercised bad faith at the four CSE meetings by not sharing their intention to have D.N. remain at Elija as he had in the past." Deft.'s Br. 19. This bald assertion is undermined by evidence of record suggesting that J.V.N. attended all four CSE meetings and, together with experts and other witnesses, participated in an iterative process. IHO 146; Second SRO 9.

In *C.L.*, the Second Circuit reversed a matter without remand based upon findings by an IHO which were not considered by the SRO. 744 F.3d at 840; *see also H.W.*, 2015 WL 1509509, at *21 (following a similar approach). While neither the IHO nor the SRO considered the third prong, the IHO and SRO made sufficient findings of fact to support the notion that J.V.N. acted in good faith in D.N.'s placement process, and belie the notion that she acted in bad faith. *See, e.g.*, IHO 17 (finding that J.V.N. supplied information to the CSE during placement process); *id.* (finding that J.V.N. worked with CSE to revise proposed goals in IEP); *id.* at 20 (finding that J.V.N. placed the reasons for her disagreement with the proposed program in writing); *id.* at 22 (finding that J.V.N. evaluated D.N. privately); *id.* at 146 (finding that J.V.N. "fully participated in the CSE meetings . . . on June 19 and July 21," where the parties created goals and objectives for D.N.); *id.* at 147 ("A review of the evidence shows that goals and objectives were developed by both ELIJA and the district, with the participation of the Parent, and that the parties collaborated to review and revise them until all of the parties were satisfied); *see also* Second SRO 9 ("The parents were active participants in the process, along with their counsel, their outside professionals and the administrators at the ELIJA School . . . It is

undisputed that the CSE made changes to the student's goals based upon the parents' concerns and comments.").

Moreover, as discussed above, this matter has continued for a nearly unthinkable time; and given that the only practical effect of yet another remand is to impose additional legal costs on both parties (which may ultimately be assumed by the District but will be borne, in the interim, by the Parents), another remand seems highly unjust and inequitable. Therefore, I find that the balance of the equities weighs in the Parents' favor, and does not preclude reimbursement or warrant a reduction thereof.

### *3. **Attorney's Fees and Costs***

"The IDEA expressly provides that the court may, in its discretion, 'award reasonable attorneys' fees as part of the costs(1) to a prevailing party who is the parent of a child with a disability . . . ." *H.W.*, 2015 WL 1509509, at *21 (citing 20 U.S.C. § 1415(i)(3)(B)(i)(I)).

Plaintiffs' request that the Court find the Parents to be the "prevailing party" for the purposes of this motion, and for leave to submit a fee application for purposes of statutory attorneys' fees and costs. Compl. 20. I agree with the solution proposed by Judge Locke in *H.W.*, and hereby order the parties "to confer regarding attorneys' fees in an effort to reach an agreement without further judicial intervention," but "[i]f the parties are unable to reach such an agreement, they shall prepare and submit a proposed briefing schedule for the Court's approval." *Id.*

## CONCLUSION

Based on the foregoing, plaintiffs' motion for summary judgment is GRANTED, and defendant's motion for summary judgment is DENIED. By October 30, 2015, the parties shall provide the Court with a status report or briefing schedule regarding the attorneys' fee issue.

Dated: Central Islip, New York
September 28, 2015

/s/ Gary R. Brown
GARY R. BROWN
United States Magistrate Judge